UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DDK HOTELS, LLC, *et al.*,

                Plaintiffs,

    -against-

WILLIAMS-SONOMA, INC., *et al.*,

                Defendants.
------------------------------------------------------------X

**ORDER**
19 CV 226 (MKB) (CLP)

**POLLAK**, United States Magistrate Judge:

On February 5, 2025, defendant Williams-Sonoma ("WSI") and defendant/counter-claimant Williams-Sonoma Stores, Inc. ("West Elm") (together, "defendants") filed a letter seeking an Order requiring the plaintiffs DDK Hotels, LLC, DDK/WE Hospitality Partners, LLC, and DDK/WE Hotels Management, LLC (collectively, "DDK" or "plaintiffs") to provide 1) the models, calculations, and input data underlying plaintiffs' expert report; and 2) an order extending defendants' time to serve their own expert reports within 30 days of receipt of plaintiffs' expert disclosures. (Defs.' Ltr.).[1]

For the reasons set forth below, the Court grants defendants' request and Orders plaintiffs to provide defendants with a supplemental expert disclosure which includes citations to the exact documents from which Mr. Brown's data is derived, as well as the native versions of the tables and charts used in his report, including the calculations used therein. The Court also grants

---

[1] Citations to "Defs.' Ltr." refer to defendants' letter motion, dated February 5, 2025 (ECF No. 137). Citations to "Pls.' Ltr." refer to plaintiffs' letter dated February 13, 2025 (ECF No. 138), submitted in response to defendants' letter motion. Citations to "Defs.' Reply" refer to defendants' letter dated February 19, 2025 (ECF No. 139), submitted in reply to Plaintiffs' February 13, 2025 letter.

defendants' request for an extension of time to provide expert reports 30 days after plaintiffs produce the materials ordered herein.

## BACKGROUND

Plaintiffs served the expert report of Jeffrey S. Brown, a hospitality appraisal consultant with Cushman & Wakefield ("C&W") on January 27, 2025 (the "Brown Report"). (Defs.' Ltr. at 2). Attached to the Brown Report were a number of tables and charts which form the basis, in part, of Mr. Brown's expert conclusions and opinions. (Id.) These tables and charts are, according to defendants, derived from native spreadsheets created by Mr. Brown based on data points and calculations that are "not evident" from the face of the Report. (Id.)

Following production of the Brown Report, defendants requested production of the native versions of the models and calculations, to which plaintiffs responded by indicating that the underlying modeling and calculations were "obvious;" that defendants' experts should simply 'recreate' the spreadsheets and calculations; and that the modeling and calculations were derived from a "'proprietary' 'secret sauce'" methodology belonging to C&W, not subject to production. (Id.) Notably, C&W has not objected to the disclosure of this "proprietary" methodology. (Id. at 10). Defendants contend that they are entitled to the underlying modeling, calculations and input set forth in the spreadsheets in order to fully analyze and challenge Mr. Brown's calculations. (Id. at 2).

In response, plaintiffs submitted a letter dated February 13, 2025, arguing that defendants have not identified any requirement that Mr. Brown provide his native file excel spreadsheets with the formulas included, arguing that the Report contains all the information that WSI's experts need to verify their own conclusions. (Pls.' Ltr. at 1). Plaintiffs explain that Mr. Brown

2

is a certified MAI appraiser who was retained to opine on the value of damages to DDK in this case. (Id. at 2). In calculating damages, the WSI branded hotels created as part of the joint venture would be required to purchase furniture, fixtures and equipment from WSI and DDK would receive two forms of payment: 1) prior to the opening of the hotel, DDK would receive payments under Technical Service Agreements ("TSA") for the technical support provided; and 2) upon opening, DDK would receive payments under Hotel Management Agreements ("HMA") for their management of the hotels. (Id.).

According to plaintiffs, Mr. Brown made certain assumptions in his Report as to the monthly fee to be paid to DDK under the TSA contract, then listed the payment each month, discounted to present value and then added the discounted amounts to determine damages. (Id.) Plaintiffs contend that WSI's experts could verify these amounts "in seconds." (Id. at 3).

With respect to Mr. Brown's determination of the value of the HMA payments, Mr. Brown prepared projections of the hotel's revenues by reviewing cash flow projections prepared by DDK and, when available, cash flow projections created by an independent third-party valuation company. (Id. at 3). "Using these projections, his expertise, and other available information and knowledge," Mr. Brown prepared a cash flow projection for each hotel, which plaintiffs argue defendants' expert could understand and verify from his Report. (Id.) According to Exhibit B to the Report, three key metrics – occupancy, average rate charged per room, and the revenue per available room – were calculated and used to project the room revenue at the hotel. (Id.) According to plaintiffs, these numbers are all "hardcoded," and have all been disclosed and, therefore, "the native spreadsheet would provide no more information than the chart." (Id.) Mr. Brown also projected food and beverage revenue and other revenue, such as parking, all of which plaintiffs claim have been disclosed to WSI and its experts. (Id. at 4). He

3

then reduced the revenue by operating expenses projected by DDK to arrive at profits which he then discounted to present value. (Id.)

Plaintiffs contend that Mr. Brown has performed a similar analysis for all the hotels, and that defendants can verify his conclusions using the static model and WSI's expert does not need Mr. Brown's "model" to verify these conclusions. (Id.) Citing a decision from the Eastern District of Arkansas, plaintiffs argue that their expert is not required to disclose his spreadsheet or the formulas used to reach his results, given that the charts are sufficient to verify his analysis. (Id. at 6 (quoting Helmert v. Butterball, LLC, No. 4:08CV00342, 2011 WL 3157180, at *1 (E.D. Ark. July 27, 2011))).

In reply, defendants contend that plaintiffs have "mischaracterize[d]" the documentation sought, noting that contrary to plaintiffs' representations, Mr. Brown's analysis relies on a number of documents and data sources that are not disclosed in the Report and without which defendants are unable to determine where specific foundational figures and calculations were derived. (Defs.' Reply at 12). Specifically, defendants contend that the Brown Report contains "unexplained assumptions, calculations, and figures" which are not in the documents listed in the addendum to his Report and, in fact, the Report specifically states that Mr. Brown analyzed "'independent reports prepared by HVS, internal management projections, STR reports, and additional market data gathered by [C&W].'" (Id. (quoting Brown Report at 6)). Defendants note that only one "STAR"[2] report for the Detroit project was provided even though Mr. Brown analyzed 10 hotel projects, but that defendants reviewed every STAR report produced in this action "out of an abundance of caution," and found that none contained the figures used by Mr. Brown. (Id.) Furthermore, Mr. Brown does not provide any of the identified "market data

---

[2] Although not clear from the Brown Report, it appears that references to "STR" reports refer to "STAR" reports. (See Defs.' Reply n.3).

4

gathered by" C&W necessary for defendants to review the facts and data reviewed by Mr. Brown in reaching his opinion. (Id. at 3 & 5).

Defendants further note that while simple mathematical calculations such as multiplying one number by another can be done, the key issue here is that defendants' experts have not been given documentation showing where the numbers come from; "Mr. Brown uses figures which appear to have no grounding in any produced case document, any document listed in his 'Documents Considered,' and/or any actual origin explanation in the Report." (Id.) Defendants argue that this is why the native files are critical to show the inputs underlying the values in the charts and tables, and while many of the numbers may in fact be "hardcoded," plaintiffs' own letter supports the conclusion that there are many other numbers that are the product of undisclosed formulae and values. (Id. at 4).

Moreover, defendants contend that, contrary to plaintiffs' arguments, they are not seeking production of Mr. Brown's "working papers and notes" but are merely seeking the tables/charts themselves presented in the Report – the information actually contained in the spreadsheets. (Id. at 78). Defendants further contend that plaintiffs have not demonstrated any credible burden that would justify withholding these native spreadsheets. (Id. at 8). Their only expressed rationale is to prevent the disclosure of C&W's "template model" which defendants assert is "not even the actual spreadsheet documents at issue." (Id. at 9). Defendants contend that they are seeking the "actual spreadsheet documents" that Mr. Brown used in this case, filled with case-specific data and other relevant figures. (Id.) Defendants further note that not only has C&W not submitted an affidavit with respect to its "proprietary" interest in the template sufficient to preclude production, but there is a Stipulated Protective Order in place that contemplates protection of such materials, even of third parties. (Id. at 10).

5

DISCUSSION

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal court cases, "authorizing discovery of any 'nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" Garcia v. Benjamin Grp. Enter. Inc., 800 F. Supp. 2d 399, 403 (E.D.N.Y. 2011) (quoting Fed. R. Civ. P. 26(b)(1)). Rule 26 also encompasses expert discovery. Seawolf Tankers Inc. v. Laurel Shipping LLC, 345 F.R.D. 55, 58 (S.D.N.Y. 2023).

Relevance under Rule 26 has been "'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in th[e] case.'" Giacchetto v. Patchogue-Medford Union Free Sch. Dist., 293 F.R.D. 112, 114 (E.D.N.Y. May 6, 2013) (alteration in original) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)). While the scope of discovery is "broad," it is not "limitless." Fears v. Wilhelmina Model Agency, Inc., No. 02 CV 4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004). The party seeking discovery must show that it is not engaging in "merely a fishing expedition." Carl v. Edwards, No. 16 CV 3863, 2017 WL 4271443, at *3 (E.D.N.Y. Sept. 25, 2017) (quoting Barbara v. MarineMax, Inc., No. 12 CV 368, 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013)). The Rule requires courts to limit the extent of discovery where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C).

Rule 26 also provides the requirements for expert disclosure. See Fed. R. Civ. P. 26(a)(2). The rule requires a party to disclose the identity of its expert and to accompany the

6

expert's disclosure with a written report containing <u>inter alia</u> "the facts or data considered by the witness in forming [his opinions.]" <u>In re Elysium Health-ChromaDex Litig.</u>, No. 17 CV 7394, 2021 WL 1249223, at *1 (S.D.N.Y. Apr. 5, 2021).  The Advisory Committee notes to the 2010 amendment of Rule 26 note that "the intention is that 'facts or data' be interpreted as broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." (<u>Id.</u> (citing Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment)).  "To comply with the disclosure requirements, an expert must disclose the 'how' and 'why' the expert reached his conclusions." <u>Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.</u>, No. 21 CV 761, 2024 WL 5074923, at *2 (S.D.N.Y. Dec. 9, 2024) (quoting <u>American Railcar Indus. Inc. v. GyanSys, Inc.</u>, No. 14 CV 8533, 2017 WL 11501888, at *21 (S.D.N.Y. Nov. 14, 2017).  <u>See also</u> <u>Lava Trading Inc. v. Hartford Fire Ins. Co.</u>, No. 3 CV 7037, 2005 WL 4684238, at *7 (S.D.N.Y. Apr. 11, 2005) (holding that an expert's report must include the "essential details needed to understand and assess" the conclusions therein).

Unlike the factual data upon which an expert's opinion relies, drafts of the expert's report are not discoverable, regardless of the form they take.  Fed. R. Civ. P. 26(b)(4)(B). "Spreadsheets, graphs, presentations, and charts are protected under Rule 26(b)(4)(B), so long as the documents were prepared by the testifying expert to be included in draft expert reports." <u>Davita Healthcare Partners, Inc. v. United States</u>, 128 Fed. Cl. 584, 591 (Fed. Cl. 2016); <u>see also</u> <u>Deangelis v. Corzine</u>, 11 CV 7866, 2016 WL 93862, at *4–5 (S.D.N.Y. Jan. 7, 2016) (finding that a chart used in an expert's draft report was protected).

Here, defendants seek, and plaintiffs seek to protect, native versions of the tables and charts in plaintiff's expert report containing "models, calculations, and input data underlying Plaintiffs' expert report." (<u>See generally</u> Defs'. Ltr.).  It is well-established that "[m]otions to

7

compel are left to the court's sound discretion." Mirra v. Jordan, No. 13 CV 5519, 2016 WL 889683, at *2 (S.D.N.Y. Feb. 23, 2016) (citing Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 488 (2d Cir.1999)); see also Liberty Mut. Ins. Co. v. Kohler Co., No. 08 CV 867, 2010 WL 1930270, at *2 (E.D.N.Y. May 11, 2010) (holding that "a motion to compel is entrusted to the sound discretion of the district court").

Plaintiffs argue that there is "no reason [defendants'] expert need[s] Mr. Brown's model to be able to verify his methodology or report" because "the information is self-evident" in the versions of the spreadsheets included within the expert report, exact copies of the spreadsheets but without the underlying formulas. (Pls.' Ltr. at 2). Mr. Brown's tables, however, use figures from which defendants cannot derive their source. For example, Mr. Brown's report seems to rely on "historical operating statistics" which are not contained within the "STAR reports" produced. (See Defs.' Reply at 3 n.5). Thus, without the underlying calculations or citations to the documents upon which plaintiffs' expert derived his opinions, defendants will be unable to understand the foundation of Mr. Brown's opinion.

Moreover, plaintiffs' contention that defendants are seeking the production of Mr. Brown's "working papers" fall short. Rather, defendants are "seeking production of the specific native spreadsheet documents that Mr. Brown actually used in creating the case-specific models for his Report." (Defs.' Ltr. at 7). According to defendants, "[t]he native spreadsheets are not some separate 'working' calculations created by Mr. Brown in connection with developing his expert opinions; rather, they are the tables/charts themselves presented in the Report." (Defs.' Reply at 7) (emphasis included). Consequently, the protections provided by Rule 26 do not apply to the at-issue materials.

8

CONCLUSION

For the reasons set forth above, the Court grants defendants' motion to compel and directs plaintiffs to serve on defendants both (1) a supplemental expert disclosure which includes citations to the exact documents from which Mr. Brown's data is derived, and (2) the native versions of the tables and charts used in his report, including the calculations used therein. The Court also grants defendants' request for an extension of time to provide expert reports 30 days after plaintiffs produce the materials ordered herein.

**SO ORDERED.**

Dated: Brooklyn, New York
August 26, 2025

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York